Stephanie R. Leach (#023739)
STEPHANIE R. LEACH, PLLC
2415 E. Camelback Rd., Suite 700
Phoenix, AZ 85016
Telephone: (602) 753-9276
Stephanie@azemploymentattorney.com

Attorneys for Ms. Melendez Melendez

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE STATE OF ARIZONA

| | |
|---|---|
| Ms. Melissa Melendez, | |
| Plaintiff, | **COMPLAINT** |
| v. | **(JURY TRIAL DEMANDED)** |
| Richard Rodriguez and Rita Rodriguez, husband and wife, and the Arizona Board of Regents d/b/a University of Arizona, | |
| Defendants. | |

Plaintiff, Ms. Melissa Melendez ("Plaintiff" or "Melendez"), by and through undersigned counsel for her Complaint, hereby alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. At all times relevant, Ms. Melendez was a resident of Pima County, Arizona.

2. Upon information and belief, at all times relevant, the Arizona Board of Regents d/b/a UofA is a constitutionally created corporate body (the "UofA") in the State of Arizona.

3. Upon information and belief, at all times relevant, Defendant Richard Alan Rodriguez and Rita Rodriguez were individuals residing in Pima County, Arizona.

4. Defendants caused certain events to occur in Pima County that give rise to this action.

5. Ms. Melendez filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

6. This court has jurisdiction and Defendant has negligently caused acts to occur in Pima County, State of Arizona, which give rise to this litigation.

7. This Court has original jurisdiction under 28 U.S.C. § 1331 as this case is a civil action that arises under 42 U.S.C. § 1983 for violations of Ms. Melendez's due process rights by state actors. This Court may also exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Ms. Melendez's state law claims as they arise from the same case or controversy as the claim giving this Court original jurisdiction.

8. This action is brought pursuant to the 42 U.S.C. § 1983 for due process violations, employment discrimination and retaliation, and sexual harassment, assault and battery, and intentional infliction of emotional distress. Ms. Melendez is entitled to a reasonable award of costs and attorneys' fees against Defendants. Equitable and other relief is sought as well.

9. Venue is appropriate under 28 U.S.C. § 1391 in that a substantial portion of the events giving rise to Ms. Melendez' claims occurred in Tucson, Arizona.

10. All prerequisites of civil actions against state entities required under A.R.S. §12-821.01 have been met.

### *GENERAL ALLEGATIONS*

11. Plaintiff realleges and reincorporates the forgoing Paragraphs as if fully set forth herein.

12. Ms. Melendez began her career at the UofA in July of 2001 as an Accounting Associate in the Athletic Department. She briefly left but returned in August of 2007 to serve as Assistant to Eric Harper, the Director of Football Operations. By all accounts Ms. Melendez was extremely well liked and worked tirelessly to ensure that football operations were effective, timely, and organized. Ms. Melendez will testify that sexual harassment was not tolerated under then-Head Football Coach Mike Stoops and that his attitude of zero tolerance permeated throughout the football program.

13. Ms. Melendez was energetic, competent and hardworking – she loved her job. She was well liked by boosters and she worked hard to make them feel welcome and appreciated. Based upon her talents for building these relationships, then-Athletic Director, Greg Byrne, told Ms. Melendez that she was always welcome to transfer to

Development if she ever so desired. Development would place her in direct contact with boosters and other supporters of Arizona Athletics. Ms. Melendez was flattered but chose not to transfer, because the football program needed her, and she enjoyed the work environment under Coach Stoops.

14. The UofA terminated Coach Stoops in October of 2011 and hired Rodriguez soon thereafter. On the strong recommendation of Coach Stoops, Rodriguez retained Ms. Melendez to serve as his assistant. Ms. Melendez was eager to prove herself worthy of Coach Stoops' recommendation, so she redoubled her already tireless efforts to make sure Rodriguez had a smooth transition into his new role. However, her enthusiasm started to dwindle in 2013 with the introduction of the "Hideaway Book."

15. The Hideaway Book was a manual authored by Rodriguez and typed up annually. The Hideaway Book was for coaches and some football operations people. It was not to be disclosed to anyone else. The main focus of the book was to establish secrecy within Rodriguez's inner circle and maintain complete control of the group. This yielded such things as the saying: "Title IX doesn't exist in our office." The three people who had the most interaction with Rodriguez - Ms. Melendez, Charlie Ragle, and Miguel Reveles - referred to themselves as the Triangle of Secrecy. They were forced to lie to Rodriguez's wife to help cover up his indiscretions – primarily his extramarital affair. This Triangle was also coerced to shield Rodriguez from anything that could harm his reputation. Just for good measure, Rodriguez also befriended Ms. Melendez's then-husband, Jason, to help ensure that his Triangle stayed intact.

16. By the summer of 2015, Ms. Melendez was newly wed to Jason, but most of her attention had to be paid to Rodriguez, who had become more and more demanding. Jason recalls being shocked about the stories of Rodriguez berating staff members and how Ms. Melendez had to answer Rodriguez's calls at all hours of the night just to change travel plans or make some other requests which were only emergencies to him. She had to walk on eggshells at work, because of Rodriguez's volatility and supreme power over the department. Jason even recalls some instances during this time period where football players sent Ms. Melendez screenshots of their genitalia and illicit overtures via text. When she asked Rodriguez to intervene, he ignored her.

17. By now, most of the department knew about Rodriguez's affair and lies to his family. Many of the assistant coaches and staff were longtime friends of Rodriguez, his wife, and their children. His coaches and staff began to lose respect for Rodriguez and the web of lies had become too widespread to remain private anymore. In August of 2015, Rodriguez's daughter was in Rodriguez's office when she saw a text from his girlfriend come up on her father's iPad that said: "I love you." She demanded to know who sent the text. Rodriguez created an elaborate story, suggesting that the text was meant for someone else. As per usual, Rodriguez directed Ms. Melendez to lie for him, to which Ms. Melendez responded, "Ok, I don't know anything." Rodriguez also made Charlie Ragle and Miguel Reveles go along with the lie.

18. On November 6, 2015, Rodriguez asked Ms. Melendez to get a sideline pass for his "friend" for the USC game in Tucson, which turned out to be his girlfriend. During the game, Ms. Melendez realized that Rodriguez's wife was also on the sideline. At some point Ms. Melendez had to stand between the two hoping to avoid a confrontation. The following Monday, Ms. Melendez complained to Rodriguez about how upsetting it was to be placed in that situation. Rodriguez laughed it off without acknowledging her stress or sense of betrayal to his wife.

19. On January 27, 2016, Ms. Melendez was in Tucson when she received a call from the San Diego Marriott about a barking dog in Rodriguez's room. Rodriguez was supposed to be on a recruiting visit. Ms. Melendez called Rodriguez who didn't immediately answer. Later she learned from Coach Rod Smith that Rodriguez had walked out of their meeting when the phone rang, but did not answer. Coach Smith also confirmed that the dog belonged to the girlfriend.

20. A short time afterwards, Ms. Melendez caught Rodriguez ogling her as she left the office for that day. She had suspicions prior to that time that Rodriguez may have been staring at her, but this was the first time she caught him doing it. She simply responded, "No, you can't do that … that's not cool." She hoped that would be the end of it, but Rodriguez's bad behavior only became more egregious.

21. On February 23, 2016, upon learning that Jason was being considered as a head security officer for the Diamondbacks, Ms. Melendez told Rodriguez that she would need

to quit her job and move to Phoenix. Rodriguez responded that he didn't want her to leave, saying "No, I can't lose you." Rodriguez told Ms. Melendez that he would have a friend set up an apartment for her to stay several nights a week so she could continue working for him. Ms. Melendez told him she was unwilling to do that.

22. On May 10, 2016, Rodriguez's wife asked Ms. Melendez out to lunch. It became a 3-hour interrogation of sorts to find out what Ms. Melendez knew about Rodriguez's flirting and promiscuity. Again, per Rodriguez's strict instructions and despite Ms. Melendez's growing discomfort with doing so, she told his wife that she knew nothing and continued to cover up for Rodriguez. As it turned out, Rodriguez knew about the lunch and made Miguel Reveles call Ms. Melendez to make sure the Triangle of Secrecy had not been broken.

23. On one occasion in 2016, Ms. Melendez was wearing a light colored top and two coaches made inappropriate comments, and shouted "Damn!" as she walked out. Whenever Rodriguez asked Ms. Melendez into his office, he always told her to close the door behind her, which made her uncomfortable and wasn't necessary. Others began to notice, and make suggestive comments to her about what happened behind closed doors. This environment was condoned and, in many ways, encouraged by Rodriguez.

24. Sometime in 2016, Rodriguez asked Ms. Melendez to get underwear for him from the equipment area downstairs. Ms. Melendez found this degrading and out of line so she emailed Michael Barnet at equipment to get him to provide Rodriguez a clean pair. Michael took the underwear into the office instead of Ms. Melendez, as she was hoping to avoid the situation altogether. Nonetheless, Rodriguez made incredibly inappropriate comments to Ms. Melendez afterwards about how his preferred style of underwear that "visually enhanced" his genitalia when worn. Ms. Melendez pretended to ignore these comments, although they sickened her.

25. By November, 2016, Rodriguez noticeably began timing his workouts so he could walk back to his office shirtless in front of Ms. Melendez. On one such occasion, Rodriguez walked past her in just his underwear and said "Good Morning" to her to make sure she saw him.

26. On Monday, November 14, 2016, Ms. Melendez received a voicemail from La Paloma complaining that Rodriguez made sexual advances towards a young woman who had provided Rodriguez a massage. The caller "just wanted to inform the university." Per Rodriguez's instructions and the overarching rules of the Triangle of Secrecy, the complaint never made it past Ms. Melendez's voicemail.

27. The following January, Rodriguez asked Ms. Melendez to come into office and shut door; despite her discomfort with this, she agreed to do so. Rodriguez told Ms. Melendez that he began marital counseling with his wife because of issues at home. Rodriguez emphasized to Ms. Melendez that he needs to be with someone who is passionate, and Ms. Melendez understood Rodriguez to mean that he wants her to be that person, even though Rodriguez was still married and keeping his girlfriend on the side. Rodriguez told Ms. Melendez, "Whatever you need, I'm here for you" … he then grabbed Ms. Melendez, embraced her, touched the side of her breast, and tried to kiss her. Ms. Melendez managed to pull away and move her head.

28. After this incident Ms. Melendez began to look for a way out. However, her daughter was on qualified tuition reduction, and still working in the Athletic department, so she didn't want to complicate her situation by quitting. Ms. Melendez began considering a transfer into the University's Development Office to get away from Rodriguez without rocking the boat.

29. Two weeks after Rodriguez assaulted Ms. Melendez in his office, he called her back inside (again closing the door) and said he wanted to "take care of her." Rodriguez handed her $300 in cash, but Ms. Melendez refused his money. Rodriguez begged her not tell Jason or his wife. This made Ms. Melendez even more uncomfortable that Rodriguez believed she could be bought. Ms. Melendez emailed her sister about the incident.

30. On February 22, 2017, Rodriguez called Ms. Melendez into office, again telling her to close the door. After closing the door, Ms. Melendez looked up in horror to see Rodriguez grasping his penis beneath his basketball shorts which were pulled all the way up. Rodriguez carried on a normal conversation with Ms. Melendez while still holding

himself, but Ms. Melendez just looked down until he was through talking, so she could get out of there.

31. Ms. Melendez specifically told Matt Dudek about this incident. By this time Ms. Melendez and Matt had already had several conversations about the sexual harassment and the hostile work environment created by Rodriguez, whom she and Matt had begun calling "The Predator." He was also aware because, like most in football, he had witnessed it and or heard about it though others.

32. Ms. Melendez also complained several times to Associate Athletic Director, Mike Parrish, asking that he speak to Rodriguez and get him to stop the harassment. Parrish, while sympathetic to her situation failed to act on her complaints. His response was "we can't afford those kinds of problems right now… what I'm more concerned about is the misuse of funds."

33. By March 7, 2017, Ms. Melendez mustered up the conviction to ask for a transfer. She texted Mike Ketcham to ask about other positions at the University, specifically in the Development Office. Ms. Melendez scheduled a meeting with him but he later canceled without stating a reason. Ms. Melendez knew she would be well received in the Development Office, because Greg Byrne had confirmed as much; she had also received blessings from major donors who would be thrilled to have her oversee their account in Development.

34. Around the same time, Ms. Melendez broached the topic of transitioning out of the Athletic Department with Rodriguez. His response was, "Bullshit, you're not leaving, I can't let you leave, I need you." Throughout the next month, Rodriguez continued to stand very close to get skin-to-skin contact with Ms. Melendez. He was constantly glaring at her now, and she would wear skirts less often because she could feel him constantly glaring at her thighs. Ms. Melendez recalls continuous jokes from this time period about how "Title IX doesn't exist in this office."

35. On April 5, 2017, Ms. Melendez attempted to make a second appointment with Mike Ketcham to discuss transferring departments. She received no response. Shortly after trying to schedule the appointment, Rodriguez asked Ms. Melendez to help clean

out his closet, handed her underwear to fold, and told her, "I love that you want to take care of me."

36. On May 24, 2017, Ms. Melendez had lunch brought into the office for Rodriguez's birthday and invited his family in to celebrate. Rodriguez pulled Ms. Melendez aside and asked her to do a tequila shot with him in his office; Ms. Melendez declined, and felt it was highly inappropriate, especially with his family in the next room.

37. Shortly after his birthday, Rodriguez and Dusty Rutledge were standing at Ms. Melendez's desk discussing fund raising for football camps. Dusty made a comment that Ms. Melendez raises funds by rubbing her breasts on donors. Everyone within earshot laughed, including Rodriguez. Ms. Melendez pretended to ignore that comment, but later cried at the realization that the entire office thought that she had become successful by using her sexuality.

38. By April 26, 2017, Ms. Melendez began suffering migraines. On this particular day, she could not get up off the floor. She had never suffered from migraines in her life prior to this time period. On May 4, 2017, it became clear that the migraines were not subsiding, so Ms. Melendez went to the emergency room. Ms. Melendez was treated and sent home. On May 30, 2017, an EEG was performed; her migraines were attributed to stress from work. These affected her day-to-day life, her marriage and irritability with her younger children.

39. On June 13, 2017, Mike Ketcham told Ms. Melendez he didn't think there were any positions in Development open. Ms. Melendez knew this wasn't true because she saw job postings earlier that month. Mike had no further explanation as to why. Eventually Mike told her, "We can't take you; Coach [Rodriguez] would be pissed." Ms. Melendez realized she was trapped. Rodriguez had control over all the people that could allow her to leave the department, and she couldn't quit for fear of what would happen to her daughter.

40. On June 27, 2017, Rodriguez paid Ms. Melendez $6,000 for summer camp work, which Ms. Melendez thought was appropriate for the amount of work she performed. Rodriguez told her afterward that this amount was more than anyone else received, and

he gave her more money, not because she did more work or better work than the others, but because he wanted to "take care of her."

41. Not long after that, Rodriguez gave Ms. Melendez a wad of cash, approximately $1,500, and asked her not to tell her then-husband or his wife about it. She was unsure whether the cash was for her or whether Rodriguez just wanted her to hold the money. When Rodriguez explained that the money was for her and insisted that she use it for outside costs like food and gas money. Then he demanded that Ms. Melendez take him to the airport the next day. Rodriguez ended the conversation by whispering to Ms. Melendez, "I have more cash to give you." She recalls him being so close to her face that she could smell the BBQ chips on his breath. He then grazed her breast with his hand as he awkwardly reached towards her for a hug. Ms. Melendez left the office feeling violated. Rodriguez then texted her that she may need to come to his home late that night to help him with the dog, because his wife and daughter had already left on vacation.

42. Ms. Melendez came home and told Jason about having to take Rodriguez to the airport the next morning and about needing to help with the dog that evening. Jason was upset, and refused to let her go to Rodriguez's house. Ms. Melendez texted Rodriguez that if he needed help with the dog, she and Jason would come over to help. The following texts were sent:

Rodriguez: "just you"

Ms. Melendez: "I'm loyal to you and will always cover for you but it can't be me"

Rodriguez: "You know I love you" [with a kissing face emoji]

Ms. Melendez: "No! It can't be me"

Rodriguez: "Ha. I'll see you in the morning."

43. Ms. Melendez told Mike Parrish about this incident. His response was that "We don't need that in the office, but I am more concerned with his misuse of funds."

44. The next morning Ms. Melendez arrived at the office to take Rodriguez to the airport, although it had been her scheduled day off. Rodriguez passed by her desk shirtless and told her that he needed to shower in his office. Rodriguez asked Ms. Melendez to stay in his office to keep his dog calm while he showered. Instead, Ms. Melendez took the dog on a long walk to avoid interaction with Rodriguez and to avoid

seeing him naked. On her way back from walking the dog, Ms. Melendez ran into Dusty who remarked, "I just shocked the shit out of Coach [Rodriguez]! He is in his underwear."

45.  On July 24, 2017, Rodriguez physically assaulted Ms. Melendez in his office by rubbing up against her and attempting to kiss her.

46.  On July 27, 2017, Ms. Melendez got a new job with Crest Insurance. The owner, Cody Ritchie had been a major donor for the university and hired Ms. Melendez on the spot because of her work with the Development Office. The following day, Ms. Melendez gave Rodriguez her two-week notice. He tore it up, stating that it's "so depressing, can't lose you." Shortly afterward, Rodriguez's wife learned that Ms. Melendez was leaving, and scheduled another long lunch, peppering her with questions about Rodriguez's indiscretions.

47.  On August 9, 2017, Ms. Melendez filled out exit paperwork and did an exit interview with Mike Ketcham. Ketcham acknowledged that he generally knew that Rodriguez had harassed her, but he needed details from her, as he had been "insulated" from knowing exactly what had occurred. Ms. Melendez told Mike, "A lot of shit happened. I need to remove myself from this situation."

48.  August 11, 2017, was Ms. Melendez's last day. Rodriguez's wife cornered Ms. Melendez in the office and demanded to know the truth about Rodriguez's girlfriend. She asked about a photograph taken of Rodriguez and his girlfriend. Ms. Melendez admitted that she knew about the girlfriend and apologized for not telling her sooner. She demanded to have a meeting between herself, Ms. Melendez and Rodriguez. Ms. Melendez did not agree, as she did not want to get further involved. Later on that day, apparently after arguing with his wife, Rodriguez stormed out of his office yelling about his wife, "What the fuck is wrong with her?" and "Who is trying to ruin me?" Afterwards Rodriguez's wife called and texted Ms. Melendez incessantly to the point where Rodriguez called Ms. Melendez to apologize for his wife's harassment.

49.  Although Ms. Melendez had removed herself from the situation, reminders continue to pop up. On October 17, 2017, Ms. Melendez had lunch with a friend at the Trident grill. Rodriguez's wife was also there with her daughter. Ms. Melendez's friend told her, "If they only knew I booked a separate room for Coach [Rodriguez] and his

girlfriend." About two weeks after that, Ms. Melendez spoke with Matt Dudek, who called just to check on her. During the conversation, he remarked, "Just be glad your boss isn't groping you anymore."

50. On October 26, 2017 Ms. Melendez called Human Resources to complain that her daughter, who was still working for Athletics, was being given significantly more work hours than allowed for a student. However, upon identifying herself Ms. Melendez's call to Human Resources was rerouted several times until she was told she was speaking to Kristen Klotz, who was apparently in charge of investigating Rodriguez's conduct – at the time, Ms. Melendez didn't know whether that conduct was just Rodriguez's sexual harassment or also his misuse of money. Klotz identified herself as the Equity Officer and Deputy Director of Institutional Equity and told her that the University had been trying to reach her and that the University knew that she left because of what Rodriguez did to her. Klotz also requested that Ms. Melendez meet with her to provide more details.

51. Ms. Melendez complied with the request, and she and Jason met with Klotz shortly thereafter. Klotz asked Ms. Melendez if Rodriguez had ever sexually harassed her. Ms. Melendez said that Rodriguez had done so. However, Klotz's follow up questions about the details rekindled the fear Ms. Melendez had during the exit interview – "If I tell what happened, heads will roll," she thought. Ms. Melendez was also worried that any comments might get publicized, and she thought it would be best to consult with an attorney before providing further comment. Ms. Melendez ended the interview politely, and sought legal counsel.

52. Also in October, Ms. Melendez had a conversation during a football game with a prominent football booster. He told her that "I know what Coach [Rodriguez] has done," and said, "I don't agree with that shit." He said he respected Ms. Melendez for how she left quietly. Ms. Melendez began to realize how widespread these rumors had become, and although the booster respected her for how she handled it, her good name was now defamed throughout the University.

53. Meanwhile, for the last year of her employment under Rodriguez, staff members throughout the University began to speculate about what was going on behind Rodriguez's closed office door. Tucson is a small community, and rumors, especially

salacious ones, spread fast. Although Ms. Melendez has a new job, she constantly runs into old acquaintances and wonders whether they think she was nothing more than Rodriguez's concubine all those years. He certainly never did anything to dissuade others from assuming as much.

54. Although the migraines have subsided, the nightmares have not. Ms. Melendez entered counseling to help her deal with the ongoing stress of being in such an abusive work environment and help her move on from it.

## COUNT I - VIOLATIONS OF MS. MELENDEZ'S DUE PROCESS RIGHTS BY DEFENDANTS IN VIOLATION OF SECTION 1983
### (*Civil Damages*)

55. Mr. Melendez repeats and realleges the allegations set forth above as if fully set forth herein. Defendants, acting under color or custom of state law in the course and scope of their employment, affirmatively acted to deprive Ms. Melendez of her clearly established rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution, including her rights to due process.

56. While Ms. Melendez resigned from the UofA, this resignation was because her working conditions had become so intolerable, that any reasonable person would have felt compelled to resign and the UofA failed to take action to address her concerns regarding Rodriguez's harassment.

57. Ms. Melendez has been her due process rights as a direct result of the actions of Defendants.

## COUNT II – ASSAULT AND BATTERY
(against all Defendants)

58. Plaintiff hereby realleges and incorporates as though fully set forth herein all of the allegations in the preceding paragraphs.

59. Rodriguez intended to engage in offensive and harmful physical contact with Plaintiff's body.

60. Rodriguez's conduct in touching and attempting to touch Ms. Melendez was intentional.

61. Rodriguez's conduct in touching and attempting to touch Ms. Melendez placed her in apprehension of imminent offensive physical contact by Rodriguez.

62. Rodriguez' conduct amounts to willful and wanton conduct.

63. As a result of Rodriguez' conduct, Ms. Melendez suffered and continues to suffer fright, physical illnesses, mental anguish, humiliation and embarrassment.

64. Defendant, UofA, is directly responsible for the assault and battery endured by Ms. Melendez because it knew or in the exercise of reasonable care should have known about such conduct, but failed to take reasonable steps to prevent or correct it.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (against all Defendants)

65. Plaintiff hereby realleges and incorporates as though fully set forth herein all of the allegations in the preceding paragraphs.

66. The above-described harassment by Defendants was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish and emotional and physical distress. Defendants' conduct was further done with a wanton and reckless disregard of the consequences to Plaintiff.

67. As a proximate result of the acts alleged herein above, Plaintiff suffered humiliation, mental anguish and emotional and physical distress of mind and body in the form of fear, shock, anger, worry, humiliation, nervousness, irritability, insomnia, loss of appetite to all of Plaintiff's damage in a sum to be determined according to proof at the time of trial.

68. As a direct and proximate result of the aforementioned conduct of these Defendants, and each of them, and as a further, direct and proximate result of Plaintiff's severe mental anguish, emotional distress, and physical injury, Plaintiff has suffered general and special damages, the exact amount will be proven at trial.

69. As a further, direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has been and will continue to be injured in her future employment, occupation and income in an amount which will be proven at trial.

70. By reason of the above described unlawful conduct, Defendants have acted maliciously, despicably, oppressively and fraudulently towards Plaintiff and in a willful

and conscious disregard of her rights, health, safety and feelings. Defendants have further acted maliciously, despicably, oppressively and fraudulently and in willful and conscious disregard of her rights, health, safety and feelings to an additional extent which is unknown to Plaintiff at this time, but is well known to Defendant. That by reason of the foregoing, Plaintiff demands punitive and exemplary damages from Defendant, to the extent permitted by law, in a sufficient sum to be awarded by the trier of fact at the time of trial.

71.     Defendant, UofA, is directly responsible for the intentional infliction of emotional distress endured by Ms. Melendez because it knew or in the exercise of reasonable care should have known about such conduct, but failed to take reasonable steps to prevent or correct it.

72.     Plaintiff requests an award of attorneys' fees and costs against Defendants.

73.     Plaintiff is further entitled to prejudgment interest at the legal rate per annum and damages according to proof.

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

    A.    Ordering the payment of compensatory damages in an amount to be determined at trial;

    B.    Awarding Plaintiff punitive damages in an amount sufficient to punish the Defendant and to deter others from emulating its conduct;

    C.    For back pay and front pay;

    D.    For attorney's fees and costs;

    E.    For prejudgment interest and post judgment interest at the maximum allowable rate;

    F.    For any other relief the court deems proper.

RESPECTFULLY SUBMITTED this 24th day of July, 2019.

STEPHANIE R. LEACH, PLLC.


By  /s/Stephanie R. Leach
Stephanie R. Leach
2415 E. Camelback Rd., Suite 700
Phoenix, AZ  85016