J. Greg Coulter (State Bar No. 016890)
Monica M. Ryden (State Bar No. 023986)
**JACKSON LEWIS P.C.**
2111 East Highland Avenue, Suite B-250
Phoenix, AZ  85016
Telephone: (602) 714-7044
Facsimile: (602) 714-7045
greg.coulter@jacksonlewis.com
monica.ryden@jacksonlewis.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Ms. Melissa Melendez,<br><br>            Plaintiff,<br><br>      v.<br><br>The Arizona Board of Regents d/b/a University of Arizona,<br><br>            Defendant. | Case No.: 4:19-cv-00377-RM<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, defendant The Arizona Board of Regents d/b/a University of Arizona ("Defendant", "ABOR," or "the UA") moves for summary judgment on the claims asserted by plaintiff Melissa Melendez ("Plaintiff," or "Melendez") in her complaint (the "Complaint").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

ABOR is entitled to summary judgment on the Title VII hostile work environment/sexual harassment and retaliation claims because Melendez cannot establish that she exhausted administrative remedies in a timely manner by filing a charge with the EEOC or relevant agency within 300 days of the allegedly discriminatory conduct.

Even if Melendez's claims were timely (they are not), ABOR has an affirmative defense to liability. The Faragher-Ellerth affirmative defense applies in this case to protect ABOR because ABOR exercised reasonable care to prevent and correct harassing behavior through an effective policy, and Melendez unreasonably failed to take advantage of corrective opportunities. Melendez's retaliation claim also fails as a matter of law where Melendez did not engage in protected activity.

Even if Melendez's claims were timely and she could prove liability, Melendez is not entitled to back pay or front pay where she failed to mitigate her damages. Moreover, under state statute, punitive damages are not authorized in Title VII discrimination cases against ABOR.

## II.   BACKGROUND

Melendez worked as an accountant for the UA Athletics Department from 2001 to 2005. She then left the University in 2005 to pursue a career as a realtor. In September 2010, Melendez returned to the UA Athletics Department in the position of Administrative Assistant, and then Administrative Associate.

Richard Rodriguez became the UA's Head Football Coach in November 2011. As an Administrative Associate in the football program, Melendez worked directly with Coach Rodriguez. During the time that she worked for the UA football program, Melendez also performed additional work for Coach Rodriguez and his wife on occasion, as well as worked for Coach Rodriguez's football camps.

Melendez admits that nothing happened between June 27, 2017 and her last day of employment at UA that supports her claims. Melendez had minimal interaction with Coach Rodriguez in the month leading up to her resignation. On July 28, 2017, Melendez gave notice that she was resigning her employment with the UA and would be leaving her position on August 11, 2017. After she gave her notice to Coach Rodriguez, which she says he took well, he was gone to California for a few days, and the remainder of her employment was uneventful. Her last day of employment at the UA was August 11, 2017.

Tellingly, while she was employed at the UA, Melendez did not avail herself of any of the UA's policies relating to Nondiscrimination and Anti-Harassment or report such allegations to the UA's Office of Institutional Equity ("OIE"). Rather, two months after her employment with the UA ended, in October 2017, UA personnel informed OIE that a donor, who is not a UA employee or otherwise affiliated with the UA, had recently reported having a conversation with Melendez in which she alleged that Coach Rodriguez had engaged in inappropriate conduct of a sexual nature toward her. This was the first time the UA was put on notice that Melendez had any concerns related to her former employment. As explained in more detail below, the UA immediately began investigating these allegations.

Melendez refused to participate in the investigation. Ultimately, a detailed investigation into Melendez's allegations produced no evidence to support a finding that Coach Rodriguez violated the UA's Nondiscrimination and Anti-Harassment Policy.

### III.  PROCEDURAL BACKGROUND

On January 19, 2018, Melendez provided a notice of claim to the Arizona Board of Regents regarding her claims against the University of Arizona.

On June 5, 2018, Melendez filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

On July 24, 2019, Melendez filed her initial complaint, which she later amended twice. On October 10, 2019, the EEOC issued Melendez a Notice of Right to Sue. Melendez filed her Amended Complaint on November 25, 2019. (Doc. 15.) She filed her Second Amended Complaint on February 26, 2020. (Doc. 21.)

The Second Amended Complaint ("Complaint") (Doc. 21), which is the operative complaint, contains two counts. The first count alleges that Melendez "was forced to perform her duties in a hostile work environment" and that the "sexual conduct of Coach Richard Rodriguez purposefully or unreasonably interfered with her ability to perform her job and created an intimidating, hostile and/or offensive work environment." (Complaint, Doc. 21, ¶ 89.) The second count alleges that the UA retaliated against her

3

because "[s]he requested a transfer to another department on three separate occasions and was told that she could not transfer by an employee of the Development Department because Richard Rodriguez 'would be pissed.'" (*Id.* ¶ 93.) Melendez does not allege that she engaged in protected activity. (*Id.*) Rather, she alleges that "[s]everal members of the Athletic Department were aware that Richard Rodriguez was sexually harassing [her]." (*Id.*) Both counts assert that the alleged conduct is a violation of Title VII.

## IV. UNDISPUTED FACTS

### A. Melendez did not file the EEOC charge until June 5, 2018.

All of the acts alleged in counts one and two of the Complaint took place on or before June 27, 2017. (SOF ¶ 1.) Melendez had minimal interaction with Coach Rodriguez in the month leading up to her resignation. Coach Rodriguez was on vacation in Atlanta, Georgia from June 28, 2017, to July 21, 2017, and the office was essentially closed with everyone out on vacation. (*Id.*) Melendez testified that nothing happened during that time period that supports her claims:

> Q. What was your vacation? What day – days were you on vacation?
>
> A. I don't remember, sir.
>
> Q. And Coach Rodriguez was on vacation from June 28th to July 21st?
>
> A: The whole office was out, yes, sir.
>
> Q. Did you have any contact with him or anyone in the office during that time frame?
>
> A. I don't remember, sir.
>
> Q. If you did, would it be in your – Well, you don't remember. There's nothing that sticks out that you had contact with anyone during that time?
>
> A. I mean I could have. People always needed something from me.
>
> Q. Well, there's nothing as part of your claim that you're going to say that happened during that time period, right?
>
> A. No, sir.
>
> Q. Everyone was separated. Coach Rodriguez was in

4

> Atlanta with his family. At some point, you go to Florida, right?
> 
> A. I never went to Florida.
> 
> Q. I mean California.
> 
> A. Vegas? I – I don't know where I was. Disneyland? Oh.
> 
> Q. Yea, says Disneyland.
> 
> A. I renewed my vows in Vegas, took children to Disneyland

(*Id.*)

After everyone returned from vacation, on July 26 and 27, 2017, Coach Rodriguez was in California. (SOF ¶ 2.) Melendez interviewed for a position at Crest Insurance during this time. On July 27, 2017, Melendez got a job offer from Crest Insurance as an account executive selling insurance. (*Id.*)

On July 28, 2017, Melendez gave two-weeks' notice that she was resigning to take a new job. (SOF ¶ 4.) She delivered her resignation letter to Coach Rodriguez in his office. (*Id.*) Melendez testified that nothing happened during that meeting that supports her claims:

> Q. Okay. How long did this conversation last?
> 
> A. Maybe 10 minutes.
> 
> Q. And what did you tell him?
> 
> A. That I was leaving.
> 
> Q. What did he say?
> 
> A. He said, "That's so depressing." He didn't want me to leave. Got pissed. Ripped up the letter. Started shaking his head. Started tearing up.
> 
> Q. Anything else you recall?
> 
> A. He was upset.
> 
> Q. And what did you say?
> 
> A. I told him I needed to leave?
> 
> Q. Anything else you recall saying?
> 
> A. No sir.
> 
> Q. So there's nothing about that meeting that you claim is supportive or evidence of your sexual harassment or

5

retaliation claims, right?

A. I don't think so.

(*Id.*)

Excerpts from Melendez's planner reflect various events in her last few weeks of employment, including, among other things, her two-weeks' notice on July 28, 2017, meeting with Monica Blancarte in HR on July 31, 2017, lunch with Rita Rodriguez on August 2, 2017, lunch with Heather Perrin from Crest Insurance on August 4, 2017, and an exit interview with Mike Ketcham on August 9, 2017, which Mike Ketcham set up. (SOF ¶ 5.)   Nothing happened during this time period that supports her claims. (*Id.*)

Melendez testified that the last event that she claims is supportive of her allegations of sexual harassment and retaliation was on June 27, 2017. (SOF ¶ 6.) Melendez's own evidence supports this, including a planner she kept during her employment and a timeline she created before her notice of claim. (*Id.*)

As discussed above, Melendez did not file her Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") until June 5, 2018. (SOF ¶ 7.) Because all of the events supporting Melendez's claims took place on or before June 27, 2017, her EEOC Charge was filed, at the earliest, 343 days after the events alleged in her lawsuit.

**B. The UA had an effective anti-harassment policy, and Melendez unreasonably failed to take advantage of corrective opportunities.**

The UA had a comprehensive nondiscrimination and anti-harassment policy. (SOF ¶ 8.) Melendez was aware of the UA's policy against harassment. (SOF ¶ 9.) She testified that she took an online quiz on anti-harassment on an annual basis. (*Id.*) She knew how to contact Human Resources and the OIE Athletics Department liaison. (SOF ¶ 10.) Although she claims she did not know she could report to them, she believed she could report to the Associate Athletic Director or the Athletic Director himself. (SOF ¶ 11.)

But Melendez never failed to take advantage of corrective opportunities available to her, and she never made a complaint. (SOF ¶ 12.) Despite her assertion that the Associate Athletic Director, Mike Ketcham, must have known about the alleged harassment, there is no evidence to support this assertion. (*Id.*) She admittedly lied on her exit questionnaire about having no concerns. (*Id.*) She never told the Associate Athletic Director, or any other administrator, that she had any concerns about sexual harassment. (*Id.*) Any vague statements to the Associate Athletic Director during her exit interview were void of any such reference to illegal sexual harassment. (SOF ¶ 13.) Melendez has no evidence that the Associate Athletic Director had any idea about what was going on with regard to her allegations. (*Id.*) He did not. (*Id.*)

Melendez alleges that she had previously requested a transfer to another department on three separate occasions, and the Associate Athletic Director told her that she could not transfer because Richard Rodriguez 'would be pissed." (SOF ¶ 14.) Mr. Ketchum did not handle hiring for the Development Department. (SOF ¶ 15.) Even if he expressed his opinion that Coach Rodriguez would not be happy to lose Melendez as an Administrative Associate, he never had any discussion with Coach Rodriguez about Melendez potentially transferring to the Development Office. (*Id.*) There is no evidence that Melendez applied for a job in the Development Department. The evidence shows she did not apply. (SOF ¶ 16.) Melendez has no evidence that the Associate Athletic Director had any idea about what was going on with regard to her allegations. Melendez testified that she was hoping Mr. Ketcham knew what was happening to her because she had already told Mike Parrish and Matt Dudek. (SOF ¶ 17.) But Melendez never told Mr. Parrish or Mr. Dudek that she believed herself to be the victim of sexual harassment by Coach Rodriguez, and they never witnessed any sexual harassment by Coach Rodriguez. (*Id.*) Thus, there was nothing for them to report.

**C. Even after her employment, Melendez failed to cooperate with the UA's efforts to investigate her allegations.**

Two months after her employment with the UA ended, in October 2017, UA

7

personnel informed OIE that a donor had recently reported having a conversation with Melendez in which she alleged that Coach Rodriguez had engaged in inappropriate conduct of a sexual nature toward her. (SOF ¶ 18.) This was the first time the UA was put on notice that Melendez had any concerns related to her former employment. (*Id.*)

OIE Deputy Director, Kristen Klotz, promptly connected with Melendez. (SOF ¶ 19.) The Deputy Director met with Melendez and her husband the same day, at which point Melendez made numerous statements about Coach Rodriguez and said she would provide additional documents supporting her statements. (SOF ¶ 20.) The Deputy Director followed up with Melendez at least three times by email and phone, but Melendez ultimately chose not to submit such a complaint. (SOF ¶ 21.) Melendez also did not follow up to provide the Deputy Director additional supporting documents she alleged to have in her possession and that she told the Deputy Director she would promptly provide. (SOF ¶ 22.) Specifically, she mentioned having text messages from Coach Rodriguez that would support her statements. (*Id.*)

Despite Melendez's failure to substantiate or pursue her claims, the UA nevertheless hired a team of outside investigators—with no prior relationship with Melendez—to investigate her sexual harassment allegations against Coach Rodriguez. (SOF ¶ 23.) Once again, Melendez failed to cooperate with the UA's efforts to investigate her allegations notwithstanding repeated attempts to encourage her to do so. (SOF ¶ 24.) Despite Melendez's refusal to participate in the investigation, the investigators undertook a comprehensive investigation, reviewing a great deal of documents and speaking with twelve witnesses, none of whom collaborated Melendez's claims. (SOF ¶ 25.) As a result, the investigation conducted by the law firm Cohen Dowd Quigley P.C. concluded that the greater weight of the available evidence did not support a finding that Coach Rodriguez violated the UA's Nondiscrimination and Anti-Harassment Policy. (SOF ¶ 26.)

### D. Melendez earned more at her subsequent employment.

Melendez made more money working for Crest Insurance then she did for the

UA. (SOF ¶ 27.) She was terminated from Crest Insurance for failing to pass her insurance license test, which was a requirement for her position. (SOF ¶ 28.) In her deposition, Melendez testified that she only took the insurance license test once, and she missed a passing score by one point. (SOF ¶ 29.) However, the evidence shows Melendez took the insurance license test three times. (SOF ¶ 30.) She failed each time. (*Id.*) She never came within one point of a passing score. *(Id.)*

Following her dismissal from Crest Insurance, rather than renew her real estate license, Melendez went on to work for Mesa Airlines. (SOF ¶ 31.) Melendez later quit her job with Mesa Airlines due to concerns about the COVID-19 pandemic, and has since returned to real estate. (SOF ¶ 32.)

## V. LEGAL ARGUMENT

### A. ABOR's Motion for Summary Judgment Should be Granted

ABOR has satisfied the summary judgment standard, and ABOR's motion for summary judgment should be granted. Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine whether summary judgment is appropriate in a Title VII case, the ultimate question of law is whether the evidence is sufficient to create a genuine issue of fact as to whether the employer discriminated against the plaintiff because of a protected characteristic. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006).

### B. Melendez's EEOC Charge Was Untimely

The Court should grant summary judgment because Melendez failed to file the EEOC charge within the statutory time frame. A complainant must exhaust administrative remedies in a timely manner by filing a charge with the EEOC or relevant agency within 300 days of the allegedly discriminatory conduct.[1] 42 U.S.C. § 2000e-5(e)(1). Filing a timely EEOC charge is a jurisdictional prerequisite to filing a Title VII

---

[1] Arizona is a deferral state. Therefore, a 300-day statute of limitations is applicable, rather than the presumptive 180-day statute of limitations.

9

lawsuit. *Lewis v. City of Chi.*, 560 U.S. 205, 210 (2010); *Equal Employment Opportunity Commission v. California Psychiatric Transitions, Inc.*, 644 F. Supp. 2d 1249, 1264 (E.D. Cal. 2009). For hostile work environment claims of a continuing nature, the aggrieved employee must allege "at least one discrete act had occurred within the 300–day time frame." *Ariz. ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1202 (9th Cir. 2016) (quoting *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 892 (9th Cir. 2004)). An individual's failure to file a charge with the agency within this time frame will usually operate to bar that person from bringing a lawsuit for failure to exhaust their administrative remedies. *Id.* (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393–94 (1982)).

Here, there is no doubt Melendez's claims squarely fall outside of the 300-day statute of limitations. In her deposition, Melendez testified that all of the acts alleged in counts one and two took place on or before June 27, 2017. (SOF ¶ 1.) Melendez's own evidence supports this, including a planner she kept during her employment and a timeline she created before her notice of claim. (SOF ¶ 6.) She did not file the EEOC charge until June 5, 2018—almost a year later and 43 days beyond the 300-day statute of limitations. (SOF ¶ 7.) Thus, she failed to file the EEOC charge within the statutory time frame, and therefore ABOR's motion for summary judgment should be granted.

### C. ABOR Is Protected by the Faragher-Ellerth Defense

The Faragher-Ellerth affirmative defense applies in this case to protect ABOR because ABOR exercised reasonable care to prevent and correct harassing behavior through an effective policy, and Melendez unreasonably failed to take advantage of corrective opportunities. The Faragher–Ellerth defense, which shields an employer from liability for a supervisor-created hostile work environment, can only be raised if no tangible employment action is taken against the employee. *Pa. State Police v. Suders*, 542 U.S. 129, 140-41 (2004); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 780 (1998); *Holly D. v. Calif. Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2003); *Kohler v. Inter-Tel Technologies*, 244 F.3d

1167, 1178 (9th Cir. 2001). Melendez does not allege that she experienced any tangible adverse employment action. She alleges that she requested a transfer to another department on three separate occasions, and the Associate Athletic Director told her that she could not transfer because Richard Rodriguez 'would be pissed.'" (SOF ¶ 14.) But Mr. Ketchum did not handle hiring for the Development Department. (SOF ¶ 15.) Even if he expressed his opinion that Coach Rodriguez would not be happy to lose Melendez as an Administrative Associate, he never had any discussion with Coach Rodriguez about Melendez potentially transferring to the Development Office. (*Id.*) And there is no evidence that Melendez applied for a job in the Development Department. The evidence shows she did not apply. (SOF ¶16.)

The Faragher-Ellerth defense is available if (a) the employer exercised reasonable care to prevent and correct any harassing behavior and had a readily accessible and effective policy for complaints of harassment, and (b) the employee unreasonably failed to take advantage of any such opportunities provided by the employer or otherwise avoid harm. *Vance v. Ball State Univ*, 570 U.S. 421, 424 (2013); *Pa. State Police v. Suders*, 542 U.S. 129, 145-46 (2004); *Craig v. M O*, 496 F.3d 1047, 1055 (9th Cir. 2007).

Here, the UA exercised reasonable care to prevent and promptly address alleged harassment. It has adopted comprehensive anti-harassment policies and complaint procedures, and Melendez admits she received annual training on these policies. (SOF ¶¶ 8-9.)

Melendez unreasonably failed to take advantage of preventative or corrective opportunities provided by the UA. She never made a complaint during her employment. (SOF ¶ 12.) Despite her assertion that the Associate Athletic Director, Mike Ketcham, must have known, there is no evidence to support this assertion. Melendez admittedly lied on her exit questionnaire about having no concerns. (*Id.*) She never told the Associate Athletic Director, or any other administrator, that she had any concerns about sexual harassment. (*Id.*)

Even after her employment, Melendez failed to cooperate with the UA's efforts to

investigate her allegations. The OIE Deputy Director followed up with Melendez at least three times by email and phone, but Melendez ultimately chose not to submit such a complaint. (SOF ¶ 21.) The outside investigators also followed up with Melendez's attorney multiple times, but Melendez chose not to participate in the investigation. (SOF ¶ 24.)

### D. Melendez's Retaliation Claim Fails as a Matter of Law

ABOR did not unlawfully retaliate against Melendez under either the opposition or participation clause of Title VII. Title VII's anti-retaliation provision prevents an employer from interfering with an employee's efforts to enforce Title VII's basic guarantees. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004). To establish a presumption of retaliation under the McDonnell Douglas framework, an employee must present evidence showing: (1) participation in a protected activity under the opposition clause or participation clause; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). Retaliation under the opposition clause of Title VII occurs when an employer discriminates against an employee because the employee opposed an employment practice that is unlawful under Title VII. 42 U.S.C. § 2000e-3(a); *Equal Emp't Opportunity Comm'n v. Luce, Forward, Hamilton, & Scripps*, 303 F.3d 994, 1005 (9th Cir. 2002). Retaliation under the participation clause of Title VII occurs when an employer discriminates against an employee because the employee made a charge, testified, assisted, or otherwise participated in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a); *Equal Emp't Opportunity Comm'n v. Luce, Forward, Hamilton, & Scripps*, 303 F.3d 994, 1006 (9th Cir. 2002). An employee must present sufficient evidence of retaliation, directly or indirectly, to establish a causal link between discriminatory animus in the workplace and the challenged employment decision. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 283

(2009). A causal connection for purposes of a retaliation claim may be demonstrated indirectly by evidence such as protected conduct closely followed by an adverse employment action. *Maner v. Dignity Health*, No. 18-17159, 2021 U.S. App. LEXIS 24923 *31 (9th Cir. Aug. 20, 2021.)

Here, Melendez does not allege that she engaged in protected activity under either the opposition clause or participation clause. She did not oppose any sexual harassment by Coach Rodriguez. On the contrary, she admittedly lied on her exit form about having no concerns. (SOF ¶ 12.) It is well-settled that a complaint must indicate that the discrimination occurred because of sex, or some other protected class. *See Skinner v. Arizona Public Service Company*, No. CV06-2577-PHX-JAT, at *8 (D. Ariz. Mar. 30, 2009) (citing *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F.Supp.2d 970, 993-994 (C.D. Cal. 2000) (finding that the plaintiff did not establish that she was engaged in protected activity when her complaints of harassment did not mention illegal sexual harassment)). General complaints that do not indicate a connection to a protected class or that fail to provide facts sufficient to create such an inference do not constitute a protected activity under Title VII. *See id.* Any vague statements to the Associate Athletic Director during her exit interview were void of any such reference to illegal sexual harassment. They were also made at the end of her employment, *after* the alleged adverse action in which she was denied a transfer. Given the foregoing, Melendez cannot establish that she engaged in a protected activity under Title VII, and ABOR is entitled to summary judgment on Melendez's retaliation claim.

Melendez also did not file her charge or otherwise participate in an investigation, proceeding, or hearing under Title VII until long after her employment with the UA. She never participated in the UA's investigation at all.

Even if Melendez had engaged in protected activity during her employment (she did not), there is no evidence that the UA knew of the protected activity. Despite her assertion that the Associate Athletic Director, Mike Ketcham, must have known about the alleged harassment, there is no evidence to support this assertion. She never told the

Associate Athletic Director, or any other administrator, that she had any concerns about sexual harassment. (SOF ¶ 12.)

Besides, there was no adverse action. Melendez alleges that she requested a transfer to another department on three separate occasions, and the Associate Athletic Director told her that she could not transfer because Richard Rodriguez 'would be pissed.'" (SOF ¶ 14.) But Mr. Ketchum did not handle hiring for the Development Department. (SOF ¶ 15.) Even if he expressed his opinion that Coach Rodriguez would not be happy to lose Melendez as an Administrative Associate, he never had any discussion with Coach Rodriguez about Melendez potentially transferring to the Development Office. (*Id.*) And there is no evidence that Melendez applied for a job in the Development Department. The evidence shows she did not apply. (SOF ¶16.)

Finally, Melendez cannot establish a causal connection between any protected activity and an adverse employment action. Even if her request to transfer was denied for the reasons she claims, there is no causal connection between any alleged protected activity and the alleged failure to consider a request to transfer. In sum, there is no evidence of any causal connection between a protected activity and an adverse employment action.

### E.  Melendez Failed to Mitigate Any Damages

ABOR is also entitled to summary judgment on the issue of whether Melendez's claims are barred by a failure to mitigate damages. There is a general statutory duty upon the employee to mitigate damages, and a discharged employee must use reasonable diligence in finding other suitable employment, which need not be comparable to their previous positions. 42 U.S.C. § 2000e-5(g)(1); *Ford Motor Co. v. Equal Emp't Opportunity Comm'n*, 458 U.S. 219, 231 (1982); *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000).

Here, Melendez had another job when she resigned. (SOF ¶¶ 3-4.) Moreover, she made more money working for Crest Insurance then she did for the UA. (SOF ¶ 27.) Still, she seeks back pay and front pay on the basis that she was allegedly terminated

from Crest Insurance because of media attention regarding her claims against the UA and Coach Rodriguez. Once again, however, the evidence does not support her contentions. Rather, Crest Insurance terminated Melendez's employment because she failed to pass the insurance license exam. (SOF ¶ 28.) This demonstrates her failure to mitigate. Melendez cannot blame the UA for her failure to pass the insurance license exam. Melendez, who had been a realtor prior to working for the football program, never tried to renew her real estate license. (SOF ¶ 31.) She also willingly quit her position with Mesa Airlines due to concerns about the COVID-19 pandemic. (SOF ¶ 32.) Altogether, the evidence demonstrates Melendez has failed to mitigate her damages.

### F.  ABOR Is Not Liable for Punitive Damages

Punitive damages are not authorized in Title VII discrimination cases against the government, a government agency, or a political subdivision. 42 U.S.C. § 1981a(b)(1). "The Arizona Board of Regents is treated as the State of Arizona under Arizona law." *Dickman v. Arizona Board of Regents*, No. CV 08-1684-PHX-MHM, at *3 (D. Ariz. Oct. 20, 2008) (quoting *Arizona Board of Regents v. Arizona York Refrigeration Co.*, 115 Ariz . 338, 565 P.2d 518 (1977)). Its funds are state funds. *Id.* Accordingly, Title VII does not allow Melendez to recover punitive damages against ABOR. *See Taleyarkhan v. Purdue Univ.*, 837 F. Supp. 2d 965, 970-71 (N.D. Ind. 2011) (dismissing request for punitive damages because Title VII provided state university with immunity from such damages); *Googerdy v. N.C. Agr. and Tech. State Univ.*,386 F.Supp.2d 618, 625 (M.D.N.C.2005) (same); *Singleton v. Univ. of Calif.*, No. C–93–3496 MHP, 1995 WL 16987, at *3 (N.D.Cal. Jan. 6, 1995) (same). Melendez's Title VII claims, to the extent punitive damages are requested, must be dismissed.

Additionally, ABOR is not liable for punitive damages because it did not act with malicious or reckless indifference to Melendez's federally protected rights. Obtaining punitive damages under Title VII requires that the defendant engaged in intentional discrimination with malice or reckless indifference to the federally protected rights of an aggrieved individual. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281 (1994)

(superseded by statute on another basis); *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 909 (9th Cir. 1999). An employer may be liable for punitive damages under Title VII for actions of a manager: (1) when the agent has been authorized by the principal to commit the misconduct in question; (2) when the principal recklessly employed the unfit agent; (3) when the agent, acting in a managerial capacity, committed the misconduct within the scope of the employment; or (4) when the agent's bad act was subsequently approved by the principal. *Kolstad v. Am. Dental Assn*, 527 U.S. 526, 527-28 (1999); *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 773 (9th Cir. 2005). If a plaintiff demonstrates that the employer acted with malicious or reckless indifference to the plaintiff's federally protected rights and that there is a basis for imputing liability to the employer, the employer may avoid punitive liability by showing that it engaged in good faith efforts to implement an anti-discrimination policy. *Kolstad v. Am. Dental Assn*, 527 U.S. 526, 544 (1999); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 864 (9th Cir. 2002). An employer may point to a written non-discrimination policy as evidence of an employer's effort to comply with Title VII in good faith. An employer must also show that efforts have been made to implement its anti-discrimination policy through education of its employees and active enforcement of its mandate. *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 773 (9th Cir. 2005).

Melendez cannot show that the UA acted with malicious or reckless indifference to her federally protected rights and there is no basis for imputing liability to the UA. Even if Melendez could make this showing (she cannot), the UA engaged in good faith efforts to implement an anti-discrimination policy. As discussed above, the UA had a comprehensive nondiscrimination and anti-harassment policy. (SOF ¶ 8.) Melendez attested that as an employee, she received annual training on anti-harassment. (SOF ¶ 9.) The UA is committed to enforcing this policy as demonstrated by its investigation in this matter. (SOF ¶¶ 18-26.) Accordingly, even if Title VII allowed Melendez to recover punitive damages against ABOR (it does not), there is no factual basis for an award.

## VI. CONCLUSION

For all these reasons, ABOR requests summary judgment on the claims asserted by Plaintiff. ABOR asks the Court to dismiss the Complaint with prejudice and award ABOR its attorney's fees.

Dated: September 24, 2021

                                          JACKSON LEWIS P.C.

                                          By: */s/ Monica M. Ryden*
                                               J. Greg Coulter
                                               Monica M. Ryden
                                               Attorneys for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Stephanie R. Leach
STEPHANIE R. LEACH, PLLC
2415 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
Stephanie@azemploymentattorney.com

Darren Heitner
Heitner Legal, PLLC
215 Hendricks Isle
Fort Lauderdale, FL 33301
Darren@heitnerlegal.com
*Attorneys for Plaintiff*


By: /s/ Miranda L. Dotson


4811-5613-9258, v. 4